John BARNS, Plaintiff–Appellee,

v.

UNDERWRITING MEMBERS OF LLOYDS, LONDON, Subscribing to Policy Number 832/N 021147, Defendants–Appellants.

No. 88–1168.

United States Court of Appeals, Fifth Circuit.

March 3, 1989.

Kevin B. Wiggins, John H. Marks, Jr., Strasburger & Price, Dallas, Tex., for defendants-appellants.

Richard Jackson, Richard Jackson & Assoc., Dallas, Tex., for plaintiff-appellee.

Before REAVLEY, HIGGINBOTHAM and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

John Barns played offensive tackle for Stanford University. Before his final year of college competition, Barns purchased an insurance policy from Lloyds of London covering the possibility that an injury would keep him from playing in the National Football League. The policy provided $500,000 of coverage

> against any bodily injury or sickness which shall solely and independently of any other cause within 12 months from the date of an accident occurring or illness first manifesting itself during the policy period occasion the commencement of the permanent total disablement as herein defined of the Insured Person.

The contract further provided:

> Permanent Total Disablement as referred to herein shall mean the complete

inability of the Insured Person which prevents the Insured Person from ever being able to sign for his intended professional Football Contract.

The policy established a "period of Insurance from 9th August, 1985 to 30th August, 1986." A physical examination showed that Barns was healthy when he purchased the insurance coverage.

Barns tried out for the Seattle Seahawks in the spring of 1986. The Seahawks and Barns signed two contracts covering the 1986–87 and 1987–88 seasons—the standard form contracts used by every team in the NFL. Barns signed on April 30, 1986 and received $5000. The purpose of these contracts was to make Barns the Seahawks' "property" for the two seasons. That is, Barns could not join any other team during the contract period. The Seahawks, following the practice of every NFL team, did not examine Barns at the time of signing. Instead, the contracts provided:

PHYSICAL CONDITION.... Player will undergo a complete physical examination by the Club physician.... If Player fails to establish ... his excellent physical condition to the satisfaction of the Club physician ... then Club may terminate this contract.

Thus, Barns' contracts were terminable by the Seahawks upon Barns' failure to establish his excellent physical condition in the standard examination.

In June 1986, Barns injured his shoulder while performing his normal exercise regimen. At the Seahawks' summer training camp, in July 1986, Barns participated in the physical examination described in his football contracts, which is given to all new and returning players. Barns' shoulder injury was diagnosed and the team exercised its right to terminate the contracts. Pursuant to standard waiver procedure, Barns was offered to every other NFL team, but received no offers because of his shoulder injury.

On August 11, 1986, Barns wrote to Lloyds demanding payment under the policy. Upon Lloyds' refusal, he filed this suit in federal court. The district court ruled

that the definition of "permanent total disablement" under the policy was ambiguous. Therefore, the court allowed extrinsic evidence of the parties' understanding of the disputed term. The jury instructions laid out the policy terms in essentially the same language used in the contract. The jury was then asked, "Do you find from a preponderance of the evidence that the Plaintiff is entitled to recover under the insurance policy?" The jury found for the plaintiff and the court entered judgment in his favor for $500,000, plus a 12% penalty for delayed payment, prejudgment interest of $15,534.24, and attorney's fees.

A. *Termination Clause*

Initially, appellants argue that Barns' insurance contract terminated when Barns first signed the contracts with the Seahawks. While the policy covered the period from August 9, 1985 to August 30, 1986, it also contained the following termination clause:

Notwithstanding anything stated to the contrary in this Condition, in the event that the Insured Person signs a contract for Professional Football before the termination date of this Policy, this Policy shall be deemed cancelled from said date of the signing and the Premium charged for this Policy shall be deemed Fully Earned and no return of premium will be allowed the Holder.

The district court ruled the termination clause unenforceable pursuant to article 3.70–7 of the Texas Insurance Code. That statute provides:

If any such policy contains a provision establishing, as an age limit or otherwise, a date after which the coverage provided by the policy will not be effective, and if such date falls within a period for which premium is accepted by the insurer or if the insurer accepts a premium after such date the coverage provided by the policy will continue in force subject to any right of cancellation until the end of the period for which premium has been accepted.[1]

---

**1.** Tex.Ins.Code Ann. art. 3.70–7 (Vernon 1981).

On appeal, Lloyds challenges the district court ruling.

The district court relied on *Bomar v. Trinity National Life & Accident Insurance Co.*[2] In *Bomar,* the insured renewed a major medical policy covering himself and his family for a one year period. The policy provided that "coverage for any child terminates upon marriage." The insured's daughter married soon after the policy renewal period began running. Some months later, but still during the policy term, the daughter entered the hospital for surgery. The court found the policy provision terminating coverage for any child upon that child's marriage unenforceable under article 3.70–7.

We agree with the district court that *Bomar* controls this case. Appellants accepted a premium covering the entire period from August 9, 1985 to August 30, 1986. The provision that coverage would terminate when Barns signed a professional football contract parallels the provision in *Bomar* terminating coverage upon marriage, and for that reason suffers a similar fate under Texas law.

Appellants contend, however, that article 3.70–7 does not apply to policies they issue as surplus lines insurers. They point out that the subchapter containing article 3.70–7 governs "individual accident and sickness insurance policies" issued by certain listed types of companies, including "Lloyds," "or any other insurer which by law is required to be licensed by the Board."[3] They then argue that since Lloyds underwriters are not required to be Board-licensed when acting as surplus lines insurers, this policy should not be covered by article 3.70–7. Essentially, appellants ask us to treat the licensing clause of the scope provision as a description modifying the entire previous list of insurers. Thus, though the statute specifically mentions "Lloyds," appellants claim that this means only Lloyds underwriters who are "required to be licensed by the Board."

◼ We are persuaded by the district court's thorough opinion.[4] The statute does not explicitly limit the cases in which Lloyds underwriters will be subject to its provisions, and we refuse to imply such a limitation. If the Texas Legislature wished to reach the result appellants contend for, it could easily have applied the statute to any insurer required to be Board-licensed, without listing specific types of companies. Alternatively, it could have expressly exempted surplus lines insurers. Since it chose neither course, we believe that "Lloyds" means "Lloyds," whether licensed by the Board or not.

B. *Ambiguity*

◼ The district court found the operative provision of Barns' policy ambiguous.

A contract is ambiguous when, after applying established rules of construction, it is reasonably susceptible to more than one meaning.

Under Texas law, the determination of whether or not a contract is ambiguous in order to permit extrinsic evidence of intent is a question of law. Once the contract is found to be ambiguous, however, the determination of the parties' intent becomes a question of fact.[5] In this contract, Barns was allowed to recover if an injury resulted in "the complete inability of the Insured Person which prevent[ed] the Insured Person from ever being able to sign for his intended professional Football Contract."

Appellants argue that only one reasonable construction exists for this language. They point out that Barns signed two standard form contracts with the Seahawks, which were identical to the contracts offered by all the NFL teams. Appellants argue, then, that these must have been the "professional Football Contract[s]" intend-

---

2. 579 S.W.2d 464 (Tex.1979).

3. Tex.Ins.Code Ann. art. 3.70–1(C) (Vernon 1981).

4. *Barns v. Underwriting Members of Lloyds, London,* 685 F.Supp. 144 (N.D.Tex.1987).

5. *Richland Plantation Co. v. Justiss–Mears Oil Co.,* 671 F.2d 154, 156 (5th Cir.1982) (citation omitted).

ed by Barns when he entered into the insurance agreement. Since he did sign two such contracts, appellants believe Barns received the full extent of the insurance coverage he bargained for before he was injured.

We agree with the district court that the word "intended" makes the insurance policy ambiguous. Though Lloyds may be correct that this particular contract was the only contract available, a doubtful proposition when one considers the lengths to which teams will go to sign certain players, it is still not clear whether Barns was aware of that fact when he purchased the insurance policy. Thus, it may well be that his "intended professional Football Contract" differed from the one commonly offered by the NFL teams. The jury could at least believe that Barns intended to sign a contract that would not condition his eligibility to play for the Seahawks on a further physical examination. We therefore find no error in the district court decision.

AFFIRMED.